Good morning. Our first case this morning is 2010-1296, MCHUGH v. HILLERICH & BRADSBY. Mr. Iorio? Is it with Iorio? Is that the correct pronunciation? Good morning. Please the court, Robert Iorio from Carr and Farrell representing the appellant on this matter. It's a patent infringement case. And the first part of my argument is going to address several points on claim construction ruling from the district court. Then I'll speak to the ruling on summary judgment of non-infringement. The main claim construction term that we take issue with is the term base of the user's fingers in the patent. The court interpreted it as being a precise location or dividing line rather than a region or area of the finger. And in construing the phrase as the location where the palm joins the fingers, the district court held that the claim language and the written description indicated that the base of the user's fingers is not a region, but rather a specific location of the hand. So what can you point us to in the specification that best makes your case? Well, firstly, what is your alternative? That's the proximal A2 pulley region of the hand. And there's anatomical references. But isn't that really here, the space between where the crease is and where your first knuckle begins? It extends all the way to the base of the fingers, including but not limited to the crease. Look at the Moore and the Doyle anatomical references. As I understand it, the A2 proximal balance region is really from the first knuckle all the way down to where the finger connects. The pulley is between the joints, Your Honor. So it's between the joint where the middle finger, the middle joint here. Don't use the middle finger. That might be a little messy. The middle part of the forefinger and the crease. The A2 pulley, the best reference is Doyle. And that's in the record at 738. And you see the A2 pulley. That's not in color at A738. But it extends from, if you look at the creases, Your Honor, there are three creases on a forefinger. And the third crease down from the forefinger is the midpoint of the A2 pulley. And that would take the A2 pulley under hand anatomy, and all of the references are the same on this point, below the proximal digital crease. I might also add, just on that point, that Dr. Kleinert, the inventor of the H&B bionic gloves and a patentee himself, agreed that the A2 pulley extends above and below the proximal digital crease, where the palm and the fingers join. And that's in the record at A944, and in his deposition testimony at 872. Can we turn to figure one of your patent? Sure. What is numbered 18 in figure one, which is referred to as the proximal phalanges? I don't know if I'm saying that right. Yes, that's correct. Is that the region that you're saying is the base of the? The base of the fingers would be between the proximal phalange 18 and ligament 16. If you shaded the area between those two points, that would be the base of the fingers. Doesn't proximal phalange 18 actually, isn't it that entire bone from the first knuckle all the way down to where the ligament is? When I'm using 18, I'm using the reference for the location. So if you were looking at the base of the fingers, would extend up from ligament 16 in figure one, and at least to where the line is on a proximal phalange 18. So that whole shaded area. So you have it going basically halfway up the proximal phalange. Correct. So it doesn't go to the next joint above it? Base of the user's fingers is halfway up the proximal phalange. How does that comport with picture 5A, which says that the attachment 52, what's listed there, is over the base of the fingers? Well, 52, figure 5A is a glove, not the hand. So it's not... One can imagine where the hand is within the glove. Yeah, but if you're getting more specific about exactly where the phalange and the ligaments are, that glove is not going to show you that. The actual hand, figure one, is a better reference for that. So if we're going to be, and that kind of is the problem, if you're going to be precise about hand anatomy, then you have to look at the hand diagrams, figure one, for example, and not a figure 5A, which is a... Yes, but unfortunately you don't have any reference in your discussion of figure one to the base of the fingers. But you do have a specific reference with regard to 5A in your specification. It says that this attachment 52 is over the base of the fingers, and that doesn't comport with the proximal phalanges, as I understand it. Well, if it's an area, it covers the base of the fingers, and then that's a bit of the problem that we have with the plane construction ruling. Should that term, base of the fingers, as used in the claims, be a single point or location, such as the proximal digital crease, or is it a region which has a height dimension? And it has to have a height dimension, because when you start reading the specification, 5A and 5B, for example, they talk about the base of the fingers as an area. For example, in 5B, further down on column four, it shows a glove embodiment. Are you on, like, line 40? Yes, line 40, and it describes figure 5B with four small grips, 56A through D, that provide support to one finger each. And it's accomplished, and this is the glove embodiment, by incorporating four grips, as shown in 56A to D, and into each of the four fingers of a glove near the base of the fingers. Those elongated members, and that's the term that we are dealing with, are in the fingers. If they are on the fingers, it has to be above the proximal digital crease and at the area of the base of the fingers. So when the court concluded that base of the fingers was a single point, that's not anatomically correct, and it's not consistent with the embodiments in the specification. If we reject your argument in plain construction, do you still have a complaint with respect to summary judgment? Sure. So you'll want to cover that pretty quickly. I will. Leaving to one side for the moment, the court's factual findings about the location of the proximal digital crease. I have two points to make. Let's assume that the court's finding, just put it to the side, was accurate. Here's what the court said on the summary judgment order. I'll just paraphrase a little bit. The bionic pads touch the proximal digital crease, but they're not located in the proximal digital crease, and the word in the claim is in. And then the court goes on to make an analogy that the location of the pads relative to the proximal digital crease is similar to the location of a page in a book relative to the binding or crease of the book. The two errors that the court made with that finding. First, taking claim one as an example, the court's construed term would read claim one in pertinent part as follows. This is putting in all the claim terms as construed by the court. A long and thin component, which returns to its original shape following a deformation in shape having an average width of approximately 4 to 15 millimeters and designed to fit at the location where the palm joins the fingers in the proximal digital crease of the user's hand. If the bionic glove, the court noted that at least it touches the horizontal line represented by the crease, but if it does so, it must be in the crease because the crease is just a horizontal line at the base of your forefinger. So if the pad, there's nothing more for a pad to do than touch that crease and it completely covers it. If it covers the crease, this limitation is satisfied. The court said, well, it touched it, but it should do more. But what more is required? If it's the proximal digital crease, which is a horizontal line as everyone agrees, nothing more is required than if it touches that crease, it's covered. It does not have to go extend below the crease. There's no limitation in Claim 1 or any of the other claims on that point. So in a gap, as used in Claim 1 and the other dependent claims, means only that the pads reached or touched the horizontal line. Since the court found that at least the pads did that much, this was satisfied and the court was incorrect in granting summary judgment. The second error in terms of the book, the binding analogy is really not precise. If the binding had on any book is going to have a measurable width, but the crease does not have a measurable. It's a tiny little single line. So if you're touching the line, you must necessarily be in the crease or in the gap. And the binding assumes that it's bigger than that, but that's not what the inner gap construction was from the court. And the evidence in the record, this is the second point on claim construction. There's significant evidence in the record showing that the finger pads are located at the base of the user's fingers and cover in the proximal digital crease. In that connection, if you have the glove on and assume for the moment, I guess the way it's constructed in the accused product, you have the padding, which is what we're talking about, the cushioning material, and then there's some stitching around it. What if you have a situation where the stitching material can be said to touch the line that we're talking about, but not the padding, which is a little bit back from that? The stitching is right at the edge of the pad, so it's really quite close. They're pretty close to coextensive. We have a few specimens, and they were in front of the court. But the member, as used in the claim... That's what I meant to say, the member. The member is the pad as it is attached to the glove. And so it would include both the padding, the resilient padding, the foam rubber padding, plus the terrycloth, which is basically the material that's sewn in around it. So you would say that in your view there would still be infringement, even if one assumes for the moment that in that structure that you've described it's only the resilient medium rather than the terrycloth that's touching the line. Because the member is composed of both. You can't have the foam rubber without some type of cloth over the top to keep it in place. So the member has to be both the foam rubber padding and the terrycloth that's sewn around it. In the specimens at issue, you find that the stitching is right at the edge. So they're really coextensive.  And the gloves, some examples in the record are the golf glove at A8-12 and A16 and the fitness glove at A8-13. And all of those photos show the stitching and the pads extending to and covering the proximal digital crease. Now with respect to, if you look at the reply brief, there's a couple of photos that I'd like to focus on just for a second. You're into your rebuttal times. I understand. You just want to make a quick statement about those photos. Yeah, the photos on page 26 of the reply brief and 24. This is the web zone that's dealt with here. And when you look at the web zones, these are the shadings in white and covered by the red circles. From a distance, it might appear that the bottom of those white mesh zones, about the top of the webbing between your fingers, the actual webbing between your fingers, that's not the case. If you look at the glove, and I have the specimen here, that white mesh allows breathing and flexibility, and it's not the case that it's at the webbing of the fingers. It actually extends about a half an inch below the webbing on the fingers on your hand and well into the palm. So if the bottom of those U's is in the palm of your hand, you can see that the pads, which are right next to it, must come over the proximal digital crease. And I think the court, in its summary judgment ruling, confused the web zones in the gloves with the webbing in your fingers. They're not in the same location. The webbing in those gloves extends half an inch into the palm of the hand, and it brings the pads over the proximal digital crease. So putting claim construction errors to the side, the court should not have entered summary judgment. I think we've had your argument. You've eaten into more than your rebuttal time. We'll restore two minutes if you need it, and if you want a couple more minutes for your argument. Thank you, Your Honor. Ms. Weitzman? Correct. Good morning. Laura Weitzman. May it please the Court, Laura Weitzman appearing on behalf of Apley, Hillerich, and Bradsby, and here today with me is General Counsel Steve Libers. This case addresses a very, very narrow issue on appeal, and that's whether adopting the plaintiff's own claim construction of a key limitation, the in-a-gap limitation, whether the district court properly granted summary judgment of non-infringement based on the undisputed design of the glove. But Mr. Iota is telling us that if you touch the line, then you're really in the crease and you satisfy it. Do you disagree with that proposition? I do, Your Honor, and the reason is that the entire point of the patent of the invention is to fill this gap that's described in Claim 1. The patent talks in Columns 3 and 4 about the reason that the grip is successful is that it fills an unused portion or gap of the hand where the ligament 16, and I'm reading from Column 3, Lines 19 through 23, is that the grip is successful because it fills this gap or unused portion of the hand where the ligament and tissue would otherwise push up over the base of the user's fingers and cause calluses and blisters. And so when we read the term in-a-gap in Claim 1, what it is really saying is that the accused member has to fit in or fill the gap. And as the district court correctly noted, if you approach, and I would say that if you look at the actual design of the glove itself when we submitted samples, and this is a glove that was submitted at 1268. Am I understanding your argument that you're saying the entire pad has to be within the gap and cannot extend up above the finger or down into the palm? Not at all. Clearly, given the dimension limitations. Four 15 millimeters is .6 inches, so it's 15 millimeters anyway, so obviously that couldn't be the case, right? More than half an inch couldn't fit in the crease. That's correct. Given the width and limitations that are described in the patent, it is clearly the case that if a member sits in the crease, it can extend both below and above, but what's critical is that it fill that gap. Fill what gap? Fill the entire crease. That it stop the ligament from pushing up over the fingers when the hand is used in a partially flexed position. It's not a surprise that on appeal the plaintiff has abandoned its doctrine of equivalence case because the function of its invention is so very different than the function of the bionic pads. In fact, the court described the two different inventions as almost antithetical. There was testimony in the record that Dr. Kleiner specifically intended to stay away from putting padding in the crease and that he designed the gloves in such a way that it would not impede the flexion of the hand when it closed. That was one of the specific intents of the glove. One thing that we haven't touched on is what does the word configured to fit mean in the context of this patent because it's not just that the member has to fit in the gap. The glove itself has to be configured and, as it was construed, designed to fit in that gap. So whether it... Not the glove, the resilient member. I'm sorry. The resilient member has to be designed to fit in that gap. And here the undisputed design of the glove, and nobody really disputes the glove. We can all look at it and see it. And I would argue that the only member the court should be looking at is the rubber foam pad. In the initial infringement contentions, that was the only thing identified as the resilient member. At the summary judgment... In other words, you're saying we should ignore the cloth, the black encasing. I do believe that the cloth should be ignored for a number of reasons. One, up until the point of summary judgment, plaintiff refused to even identify whether the resilient member was the rubber foam pad or the cloth or a combination of the two. In the initial infringement contentions, it was identified only as the rubber foam cloth. And that's in the record at A1839. It was identified as the foam rubber-type finger pad. And, frankly, terry cloth would never satisfy the court's definition of resilient. So in any case, it could not constitute part of an elongated resilient member, as the court defined it. But even if the court were to look at just the combination of the two, you'll see that even the black cloth covering, if you will, is stitched above the location that the plaintiff identified as the proximal digital crease. And so what the court noted in its claim construction order is that a pad that sits above the proximal digital crease cannot fill that gap-filling function of the claim. My question is going to be that the claim states clearly, a hand grip configured to fit in the user's hand should be used with a handled instrument. Now, maybe when you're holding your hand like this, the glove shows those pads up above the crease. But when you're gripping a bat, they necessarily move down. And that's what most of, many of the pictures in the patent are showing, is the gripping, not the flexed, pulled front hand, but rather the grip. And don't those pads slide down a little bit? They certainly did when I tried them on. So don't they slide down a little bit when you have that gripping position as opposed to the full flex? Well, Your Honor, both Mr. McHugh described his invention in terms of an extended and a partially flexed hand. Dr. Kleiner also designed his glove considering both an extended finger and a partially flexed finger. In fact, if you look at how he designed the glove, and this figure is annotated at page 16 of our brief, you'll see that he too was designing the pads in a way that they would be used in a partially flexed manner. But you'll see again that he designed the pads in such a way that they would avoid the creases. And I think that this figure, which is in A1174 of the record and in our brief at page 16, illustrates that the design of our pads was to avoid the crease, to avoid function, and to avoid filling that gap. And so one, I think the court was maybe asking, is there a, do we read in the preamble in looking at the language of the patent? There's really no dispute that both the claimed invention and the accused invention are designed to be used with handled objects in a partially flexed position. But the two inventions sought to protect the hand in very different ways. Mr. McHugh sought to protect the hand by filling the gap that's formed by a partially flexed hand. Dr. Kleiner sought to protect the hand by doing something that was counterintuitive to most people who hadn't actually performed 10,000 hand surgeries. He understood the skeletal valleys of the fingers and sought to fill the skeletal valleys. And the court asked about the A2 pulley region. The A2 pulley region does extend above and below the crease. But what Dr. Kleiner testified is that you really don't know anything about where the proximal digital crease is relative to the A2 pulley region until you slice somebody's hand open. And in fact, during the claim construction hearing, plaintiffs... Really, that can't be the test for infringement. No. No, the test for infringement here, at least as the district court defined it, was whether the elongated resilient member was in the proximal digital crease. That was the construction, the plaintiff urged... The crease and the gap are the same thing. As the court defined it. Okay, so I guess there are lots of terms thrown around, it seems like. So crease and gap are the same thing. Is there a difference between filling and touching? I believe there's a significant difference between the two. And I think it comes down to the word fitting in the gap. And if you look at the claim, when it talks... So you can touch a crease but not fill it? I believe that's correct because the filling is what the court described as the key function of the glove. And this, again, was reiterated in column 3, lines 19 through 23. And, again, in column 4, lines 49 through 53, where the court says the reason this grip is... I'm sorry, the patent says the reason the grip is so successful is that it fills the unused portion or gap of the hand where the ligament and associated muscle and tissue would otherwise push up over the fingers when you're holding a handled object. And so the whole function, and this was something that was reiterated through the patent prosecution, the in-a-gap limitation was added to overcome prior art references. Mr. McHugh distinguished those prior art references based on his gap-filling function of his patent. He added the gap limitation. When the gap limitation was first added, he reiterated that the purpose of the gap was to space skin from the user's palm, from the user's finger. As the district court noted in its decision, if you have something that is only above or distal to the proximal digital crease, and he says at most, he doesn't say at least, he says at most it touches. I don't think that he really necessarily found there was touching, but he says at most, even if it touches, it's still above the proximal digital crease and it doesn't fill it. Therefore, it does not satisfy the in-a-gap limitation and for the same reasons found that the pads could not infringe under the doctrine of equivalence. Now, Judge Moore, you asked what happens when the glove is put on. Well, the design of the glove doesn't change. One of the things the district court noted is that as you put this glove on, because of the way the glove itself is designed, you're never going to be able to fit that glove lower than where the fingers end. I call it the U-turn. It's not a very sophisticated term, but because the glove comes down, the pads are always going to continue to be stitched above where that U between the fingers hits the hand. And so even if the theory was, well, maybe they don't infringe, maybe they don't touch in an extended position, if you flex, they're necessarily going to slip down. First, there's no evidence of that in the record. There was not a single photograph, a single demonstration, a single video. Nothing was offered to the district court. There was no OJ moment? There was not. I've been waiting for somebody to ask me that. No, we didn't argue that the glove didn't fit, therefore you must acquit. But there was nothing offered to the court by way of evidence. In fact, the argument was, well, it's self-evident. But what was it self-evident from? It was self-evident from looking at a picture of a golf glove that doesn't even have foam pads and from looking at an anatomy handbook. And so there was nothing that the plaintiff offered the court at the summary judgment stage to create a tribal question as to whether those pads actually moved relative to the crease in use. Again, I would argue that because of the configure-to-fit language, how the member actually fits in use is not the test. It's whether the glove itself is designed in such a way to fill the gap. I'm sorry, whether the member is designed and configured to fit in such a way that it fills a gap. And here are the evidence from the design of the glove itself to Dr. Kleinert's notebooks from 1999, where he showed how he was designing the pad system. All these things provide objective evidence of the way in which the glove itself, the accused by on a glove itself, was designed. And they show that the design of the glove was not intended to fill the gap. So I would argue that this sort of infringement-in-use theory is, one, not legally relevant under the claim construction. But even if it were relevant, the plaintiff offered the district court no evidence of that. As the district court observed in its summary judgment order, the court said, even if I accepted your theory that in use or in practice it infringes, you provided me no evidence of that. There's nothing- Do you think the district court rejects entirely your argument that it has to fill the gap? No, quite the contrary. A528, on the other hand, HB proposes that in a gap between a palm of the user's hand and the base of the finger should mean filling the space or void above the palm of the hand and below the finger. It goes on. HB's proposed construction for in the gap is problematic because there's no space or void between the palm of the user's hand and the location where the palm joins the finger. I kind of interpreted the Florida court's decision as rejecting your fill the gap, but I admit I had trouble reconciling that with this book crease analogy. I think with respect to the claim construction, the court rejected our interpretation of in a gap that it was an area below the proximal digital crease. And that's what the court was rejecting there, and it rejected the construction that we urged the court where the court would construe the term in a gap by reference to its function. But at the summary judgment stage, and specifically in speaking to the issue of the doctrine of equivalence, the court squarely rejected the argument that we filled the gap. And in fact, I think the reason why the court talked about touching is because it was rejecting that we were in the gap. I'm looking at page 827 of the record and page 7 of the summary judgment order where the court says at most they touch, but they are not located in the proximal digital crease. And it went on to use this book analogy. Subsequently, in discussing the prosecution history and the function waive result test with respect to the doctrine of equivalence, the court again noted that a member that fits above the proximal digital crease does not fill the proximal digital crease and does not perform that same function of separating the skin between the transverse metacarpal ligament and associated tissue and the fingers when the hand is in a semi-flexed position. I see I'm running out of time. If the court had any questions on any other issues. Thank you very much. Thank you. Mr. Iorio, you've got two minutes back. I'll be very brief. The court, as Judge Moore pointed out, the court rejected a claim construction, H&B's Crawford Construction, of being a gap. So fill the gap is not what is to be used when measuring infringement. As the court construed Claim 1, the member must be designed to fit at the location where the palm joins the fingers in the proximal digital crease of the user's hand. Proximal digital crease anatomically is the single line at the base of your finger. If you touch that crease, what more is required to be in the crease? You don't have to extend below it. That would be reading a limitation that's not in Claim 1 or any other claim. A single line, when the foam pad touches it, and the court found that at least it did that, and we have evidence at 803 to 816 that shows it does more than that. But even given that factual finding by the court, because it's a single horizontal line, it's in the gap. The foam padding covers it. That limitation is satisfied, and the court should have granted a few-summary judgment for H&B. And with respect to Judge Hall's comment about the padding, when you look at the inside of the gloves, any of the specimens, the terry cloth is sewn over it. The terry cloth is a bit resilient itself, so it does have that capacity, not nearly as much as foam rubber, but the entire pad, including the terry cloth, gives it the resiliency that's required for the bionic glove and covered by the padding. So you look at the whole pad, including the terry cloth stitching over it. Because when you have it in the flex position, which is how the glove is designed, it's how Dr. Kleinert explained it, it's how it's used in practice, and you see it in the patent figure 3, you see that the pad comes over the crease. So it's touching it in the open position, it's covered it in the flex position, and that's how the gloves are used with handled objects. I think we have your argument. Thank you. Our next case is submitted. Thank you, Muriel.